3230579 in re marriage of Kathy Bremer, Appellant and James Bremer, Appellee. Mr. Kennan, you may proceed. Thank you. Um, as you know, this case is about a series of interrelated, uh, court rulings, uh, that I contend are incons or errors in the application of existing law. The net effect of those rulings will result in my client who has never had her 2004 maintenance award ever modified. That she will only be receiving $120 a month and a rearage payments plus her social security disability payments. So that is the, the principle, uh, issue that, uh, goes on in this case. But also she's, she's receiving 700, um, 725, correct? No, that's not correct. That that's what the judge McGimsey indicates in his judgment. The, she was awarded $605 as maintenance and 120 as a rearage, but because of the retroactive termination of the maintenance, the only thing she's going to be receiving is the $120 for the rearage plus her social security case disability. Okay. That's not my understanding or my of the record, but I thought the, she's, they did terminate, but, but he's, she will be receiving payments towards the rearage. And that payment amount was increased basically to a total amount of 725, which would be the original amount and, and, and add the 120. And, um, that's how I, how I believe that it's only logical way. The court got to that number of 725 per month. I, I respectfully disagree because I, it's clear that the only thing that the court was referring to is the rearage payments and, uh, the rearage payments is only $120 and, uh, uh, because the judge said 725, I can, I maintain that that is not a correct answer. All right. I was reading line three of the judgment of dissolution of marriage, but go on. Uh, I don't have the judgment in front of me, so I'm not sure what it says off the top of my head. How much was the rearage Mr. Oh, that depends on when you calculate the rearage. Now, judge, uh, Alvarado, um, indicated that the rearage should begin from January of 2008 through, um, September of 2021 when, uh, judge Alvarado indicated that, uh, James should begin making his, uh, maintenance payments of 605 plus $120 a rearage, however, uh, which judge, uh, McGinsey and judge Sexton ruling indicates that the rearage, uh, that, uh, maintenance terminated in July of 2019, therefore, it seems to me that there's an inconsistency and, and, and when, uh, uh, the maintenance, um, actually terminated because there's a difference between judge, uh, McGinsey and sets in versus judge Alvarado's, uh, ruling. So what was, when did, uh, Mr. Bremer cease making the payments under the separation agreement? Uh, we contend that he, uh, uh, didn't make any, uh, maintenance payments after September of 2004. Okay. There's a, go ahead. Is that because it was not done through the court? The payments, didn't your client testify that there were payments that were made otherwise? Well, um, a couple of times. First off my client in, before I was even involved with the case, she testified in three different court cases. I think two were in Kane and one was, may have been in DuPage where she consistently stated that, uh, um, maintenance began, uh, she had not received any maintenance payments since September of 2004. And she testified to that in the current case also. So, uh, uh, regarding there's an issue that the court said that based on, uh, Mr. Uh, um, Bremer's, uh, reasonable belief that he didn't owe any more, uh, maintenance. He terminated it. He stopped making any payments after, uh, uh, to, um, at May 7th, 2004 court ruling. That court ruling did not terminate his maintenance whatsoever. It did merely, uh, uh, dismissed the party's respective, uh, dissolution, uh, petitions. And, um, also let's see, uh, additionally, as I think I indicated in, in, in the brief, uh, that when you calculate the amount of a rearage that would be applicable, if we, if we began from 2008, according to Judge Alvarado, my client and I contend it begins in September of 2004, but using Judge Alvarado's, uh, amount, the arrearage amounts to something like $99,585. And paying that off at the rate of $120 a month would indicate that it would take 65, almost 66 years to pay that arrearage. Again, if the arrearage begins from, uh, uh, September of 2004, the dollar amount jumps up to $123,000 and the arithmetic would result in, it would take, uh, uh, Mr. Bremer, something like 87 and a half years to pay off that arrearage of any interest. Okay. Um, so you're claiming that's an error made by the trial court. Is that correct? Yes. And what's our standard review over that claim there? Oh, well, I think that there's, is contrary, contrary to the evidence presented, in other words, uh, got the rules wrong. Manifest weight. The evidence, thank you, Your Honor. Um, against the manifest weight of the evidence. What's against the manifest weight of the evidence, the payment plan or the amount of arrearage? I think the amount of arrearage is against the manifest weight of the evidence. The payment plan, at least as I believe it states, uh, Tia, that Mr. Bremer is only required to pay the $120 a month at, towards his arrearage payment. So you don't, you don't disagree with that then, right? That he has to pay $120 a month for his arrearage. Well, I think, as I also indicate, I think it was an abuse of the court's, uh, discretion. Well, isn't that a standard of review? Yes, it is. Okay. So the standard review on the plan, you, you maintain that it was an abuse of the court's discretion to make it that amount. I think it was an abuse of the court's discretion to limit his, uh, arrearage payment to $120 a month when it would take something like 69, uh, 65 plus years in order to pay off that arrearage. Okay. Mr. Keenan, I have a question. It, it just assumed for a moment that the party's final judgment, um, ordered, um, James to pay $725 per month, um, to satisfy the arrearage. Assume that that is the, the amount, and it's not the 120. Do you still, uh, are you still making the same argument that that number is, uh, abuse of discretion or against manifest weight? Yes, I would still maintain that. Uh, of course I don't have any, uh, I didn't do any arithmetic on, on that type of a calculation, but, uh, again, it does not include any, uh, statutory interest. And there's nobody wants to, well, there's no statutory interest calculated in that. So, uh, taking all the years in question, uh, the same answer's going to be that, that, uh, she's never going to get all of her arrearage payments. So what is the relief you're asking for? I actually, I'm, I stayed in my summary, uh, relief, um, uh, to reverse and remand, uh, the case back to the trial court for, uh, the issues raised therein. Well, what would satisfy that? I mean, yeah, remand back to the court, but for what? Well, for example, for one of the things is I think her, we filed them, uh, the enrollment petition in 2018, asking for a modification of, uh, uh, a maintenance that ultimately was denied therefore, uh, for maintenance, uh, uh, if she is entitled to a modification in 2018, that affects all of the numbers going forward. Uh, also, uh, uh, I maintain that, uh, uh, the court relied on, uh, Mr. Uh, James, uh, uh, uh, belief that he didn't owe any marriage, excuse, didn't owe any maintenance. And I, not only do I believe that's against, uh, uh, manifest weight of the evidence, but, uh, it, it, it, it also indicates that I don't think Mr. Bremer was being entirely honest in his, uh, uh, testimony. And again, that may go to one part. I know that, uh, he testified that he, um, made all since he got terminated from, uh, employment in, in 2000, September, 2004, he made all of his payments directly to Kathy. However, upon direct examination, why his console, he testified that he didn't deliver any payments to Kathy, nor did he mail them to Kathy because he did not know her addresses. Again, to me, that's as contradicts, uh, uh, his prior testimony and all. Okay. Almost indicating that the council, uh, um, well, it contradicts his, uh, his prior testimony. It's goes to his credibility. The trial court presumably found him credible. Yes, uh, she did. And I, I addressed that in, in, uh, the brief. Um, and I recognize that the standard is we look to, uh, uh, the, um, uh, what the trial court says, and unless something says opposite, you always assume that everything that the trial court says is correct. I understand that. Am I correct that I'm still in the green, green arrow? Yes, yes, you are.  Okay. Uh, um, I lost my train of thought, but, um, uh, if you want to ask again, cause I lost my train of thought of what I was trying to get at. Oh, well, I lost my train of thought. Was that my question? Yes. I lost mine too.  I think it was just, I think you were talking about the fact that, that, uh, the, the trial judge was Joe, what did make decisions on credibility of, of Mr. Oh, yeah. Based on his testimony that he believed that the 2007, uh, court ruling that dismissed their prospectations for dissolution of marriage terminated his maintenance obligations, and he didn't have to make any payments after, uh, uh, that particular ruling in May of 2007. And, uh, I find that relying upon his belief that a court order that did not terminate his, uh, maintenance obligation was somehow evidence that his, he, uh, had a good faith belief for not paying any more maintenance is I just don't find that a, a, that argument to be, um, factually correct or, uh, any basis in, in, in the statute or law for that. Well, let, let me go back if you would, um, to the amount of a rearage. Wasn't that a rearage calculated from that 07 time? From 20, from, uh, January 20, 2008 to 2021, there, uh, was no a rearage dollar amount stated. So therefore in the, uh, the brief I calculated it and indicated that's when I came up with, uh, at $120 a month, it takes 65 years to pay. And again, if it's from September of 2004, the dollar amount gets much greater, uh, 85 years at $120 a month. So we have one issue I think you hit upon is that the court did not find his belief that the dismissal of the cross petitions for divorce, uh, terminated his obligation to pay was not condamnations, right? Well, basically, uh, judge Alvarado indicated that based on his good faith belief, therefore it was not condemnations or, uh, compelling cause. But then the amount of a rearage was set from that, from that date, right? And that's when judge Alvarado indicated that the $120 a rearage payment. Okay.  Thank you. I, your time is up. Uh, I think that I asked the question when your time was up, but thank you for answering that. Are there any, are there any further questions from the court? I would like to indulge 45, 45 seconds or less. Oh, no, we have, we'll give you time to do. I just wanted to know if there's other questions from the court before you. You give your summary. Yeah, I don't have any any further.  Okay. Okay. Yes. Please conclude and give us a summary. That would be fine. Okay.  On May 19th, my client sent me an email, my five day notice of is up Tuesday. I sold my car at a junkyard. I've also have to find an income, low income lawyer. Cause I have no, nothing else to do on August 15th. She writes, Jim pays me on the 26th. He hasn't. I expected it today. I've had $0 for four days. Haven't eaten. Dreamed about it. And I owe the hotel $900. And in essence, I think those emails I know are not legal arguments. I recognize, but on the other hand, I think they summarize what I believe I indicate in my summary. I listed I think. Nine or 10 issues in my summary where I consider the court made errors in the application of existing law. And again, I think each one of those rulings are wrong. And, uh, that, um, that's why I stayed in my conclusion for a reverse and remand on all of the, uh, the issues set forth in the, uh, the appeal. Thank you, Mr. Kennan. Um, no further questions. Nope. Thank you, sir. Okay. Thank you very much. And that's Mr. Ken in this matter will be taken under advisement by the court. A written disposition shall issue.